IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTOPHER R., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER <br><br><br> Case #4:19-cv-00025-PK <br><br> Magistrate Judge Paul Kohler |

This matter comes before the Court on Plaintiff Christopher R.'s appeal from the decision of the Social Security Administration denying his application for disability and disability insurance benefits. The Court held oral arguments on November 13, 2019. Having considered the parties' arguments, the record, and relevant case law, the Court will affirm the administrative ruling.

I. STANDARD OF REVIEW

This Court's review of the administrative law judge's ("ALJ") decision is limited to determining whether his findings are supported by substantial evidence and whether the correct legal standards were applied.[1] "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[2] The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3] If

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[2] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[3] *Id.* at 1009–10.

supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4] The Court should evaluate the record as a whole, including the evidence before the ALJ that detracts from the weight of the ALJ's decision.[5] However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the Commissioner.[6]

## II. BACKGROUND

A.     PROCEDURAL HISTORY

In December 2014, Plaintiff filed an application for disability and disability insurance benefits.[7] The claim was denied initially and upon reconsideration.[8] Plaintiff then requested a hearing before an ALJ, which was held on November 2, 2017.[9] A supplemental hearing was held on April 20, 2018.[10] The ALJ issued a decision on May 3, 2018, finding that Plaintiff was not disabled.[11] The Appeals Council denied Plaintiff's request for review on February 5, 2019,[12] making the ALJ's decision the Commissioner's final decision for purposes of judicial review.[13]

---

[4] *Richardson*, 402 U.S. at 390.

[5] *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6] *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

[7] R. at 204–05.

[8] *Id.* at 68–78, 81–97.

[9] *Id.* at 46–64.

[10] *Id.* at 35–45.

[11] *Id.* at 12–34.

[12] *Id.* at 1–6.

[13] 20 C.F.R. § 422.210(a).

On March 19, 2019, Plaintiff filed his Complaint in this case.[14] The Commissioner filed his Answer and the administrative record on July 11, 2019.[15] On July 15, 2019, both parties consented to a United States Magistrate Judge conducting all proceedings in the case, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[16] Plaintiff filed his Opening Brief on August 30, 2019.[17] Defendant filed his Answer Brief on October 4, 2019.[18] Plaintiff filed his Reply Brief on October 17, 2019.[19]

B.     MEDICAL HISTORY

The following medical evidence is relevant to the issues raised in Plaintiff's Opening Brief.

In 2014, Plaintiff reported severe abdominal pain and spotted blood in the toilet. He was diagnosed with leukopenia, thrombocytopenia, and splenomegaly.[20] Plaintiff was eventually diagnosed with Felty's syndrome, which is a combination of rheumatoid arthritis, neutropenia, and splenomegaly.[21] Plaintiff was started on methotrexate.[22] The record reflects that Plaintiff was not always compliant in taking this medication.[23] He also has a history of diverticulitis.[24]

---

[14] Docket No. 4.
[15] Docket Nos. 9, 10.
[16] Docket No. 15.
[17] Docket No. 18.
[18] Docket No. 20.
[19] Docket No. 21.
[20] R. at 306.
[21] *Id.* at 340.
[22] *Id.*
[23] *Id.* at 846.
[24] *Id.* at 371.

Plaintiff was hospitalized from November 7, 2014, to November 10, 2014, for a myocardial infarction.[25]

On December 24, 2014, Plaintiff presented to the emergency room with complaints of abdominal pain, vomiting, and diarrhea.[26]

Between February 3, 2015, and February 8, 2015, Plaintiff was seen for ulcerative colitis and neutropenia.[27]

Plaintiff was seen by Leon Perel, M.D., from April 2015 to August 2015.[28] Plaintiff was diagnosed with cervical and lumbar spondylosis and radiculopathy.[29] Dr. Perel noted that Plaintiff's pain was well-controlled on his current medication.[30] Therefore, no interventional procedures or physical therapy was required.[31]

In late December 2015, Plaintiff was admitted to the hospital for four days because of cellulitis of the right leg.[32]

Plaintiff presented to the emergency room on April 7, 2016, with abdominal pain and constipation.[33]

---

[25] *Id.* at 379–432.
[26] *Id.* at 464.
[27] *Id.* at 440, 496–504.
[28] *Id.* at 579–606.
[29] *Id.* at 590.
[30] *Id.* at 600.
[31] *Id.*
[32] *Id.* at 814, 816.
[33] *Id.* at 799.

Plaintiff was admitted to the hospital on April 11, 2016, and discharged the following day based on abdominal pain, constipation, neutropenia, and rheumatoid arthritis.[34]

Plaintiff was seen at the emergency room on May 8, 2016, for abdominal pain, nausea, vomiting, and constipation.[35] Plaintiff again presented to the emergency room complaining of abdominal pain on May 15, 2016.[36] It was indicated that Plaintiff had chronic abdominal pain, splenomegaly, and neutropenia.[37] He again presented with abdominal pain on May 22, 2016.[38]

Plaintiff was admitted to the hospital on May 29, 2016 and discharged on June 2, 2016.[39] The discharge diagnosis indicated a MRSA infection and Felty's syndrome.[40]

Plaintiff was seen twice for abdominal pain in June 2016.[41]

Plaintiff went to the emergency room in September 2016, complaining of numbness, weakness, cough, and abdominal pain.[42]

Plaintiff was admitted to the hospital from December 4, 2016 to December 8, 2016, due to MRSA cellulitis and other issues.[43] Plaintiff was seen a number of times in December for an ulceration on his left buttock.

---

[34] *Id.* at 782.
[35] *Id.* at 773.
[36] *Id.* at 771.
[37] *Id.*
[38] *Id.* at 759.
[39] *Id.* at 726–740.
[40] *Id.* at 731.
[41] *Id.* at 710–11, 715–25.
[42] *Id.* at 682.
[43] *Id.* at 608, 622, 627–31.

Plaintiff went to the emergency room on December 22, 2016, complaining of abdominal pain and generalized body aches.[44]

Plaintiff was seen in the emergency room on January 2, 2017, for abdominal pain, pancytopenia, and dehydration.[45]

Plaintiff presented to the emergency room on January 5 and 6, 2017, with myalgia and a viral infection.[46] Plaintiff was again seen at the emergency room on January 9, 2017, for abdominal pain.[47] He again presented to the emergency room on January 13, 2017, for chronic abdominal pain and blood in his stool.[48]

Plaintiff was seen at the emergency room on January 26, 2017, for abdominal pain, among other complaints.[49] Plaintiff went to the emergency room for abdominal pain on February 1, 2017.[50] Plaintiff was admitted to the hospital on February 9, 2017, again for abdominal pain.[51]

Plaintiff was seen at the emergency room on March 5, 2017, for abdominal pain.[52] Plaintiff was hospitalized from March 15 to March 17, 2017, for chronic abdominal pain.[53]

---

[44] *Id.* at 619.
[45] *Id.* at 617.
[46] *Id.* at 612.
[47] *Id.* at 955.
[48] *Id.* at 962.
[49] *Id.* at 967.
[50] *Id.* at 1204.
[51] *Id.* at 973.
[52] *Id.* at 985.
[53] *Id.* at 993–1016.

Plaintiff again presented on March 22, 23, and 24, 2017 for abdominal pain and vomiting.[54] On March 30, 2017, Plaintiff was seen for abdominal pain.[55] Because of his multiple emergency room visits, Plaintiff was assigned a social worker to provide treatment without the use of opioids.[56] After being informed that he was unlikely to get opioids, Plaintiff got upset and left.[57]

Plaintiff again returned to the emergency room on April 12, 2017, complaining of ongoing abdominal pain.[58] Plaintiff retuned on April 17, 2017, complaining of rectal pain.[59] Plaintiff was admitted to the hospital on April 29, 2017, and discharged on May 2, 2017, for drainage and care of a perianal abscess.[60]

Plaintiff was again hospitalized from May 30, 2017, to June 1, 2017, for acute cholecystitis and had his gall bladder removed.[61]

Plaintiff was again hospitalized from June 8, 2017, to June 11, 2017, with another perianal abscess and abdominal pain.[62]

Plaintiff presented to the emergency room on July 7, 2017, complaining of generalized weakness.[63] Plaintiff again presented with abdominal pain and nausea on July 23, 2017.[64]

---

[54] *Id.* at 1017–36.
[55] *Id.* at 1038.
[56] *Id.*
[57] *Id.*
[58] *Id.* at 1058.
[59] *Id.* at 1067.
[60] *Id.* at 1070–99.
[61] *Id.* at 1100–22.
[62] *Id.* at 1123–44.
[63] *Id.* at 1146.
[64] *Id.* at 1156.

Plaintiff was hospitalized from November 3 to November 6, 2017, for cellulitis and abscesses.[65]

With regard to his mental impairments, Plaintiff was seen by James Otteson, Ph.D., in April 2014 for a psychological evaluation.[66] Dr. Otteson conducted a clinical interview and a mental status exam and administered a number of tests.[67] Dr. Otteson diagnosed depressive disorder, attention-deficit/hyperactivity disorder, learning disorder, borderline intellectual functioning, and antisocial personality disorder.[68] Dr. Otteson opined that Plaintiff's prognosis for completing on-the-job training and maintain full-time employment was "fair to good as long as he manages his depression, borderline intellectual functioning, learning deficits, and physical ailments."[69] Among other things, Dr. Otteson recommended that Plaintiff "receive assistance with any tasks that are above his intellectual functioning or which require at least an eighth grade level in reading, spelling, and arithmetic."[70]

C. HEARING TESTIMONY

At the hearing before the ALJ, Plaintiff testified that he had a fifth grade education.[71] He stated that he could read, write, and do basic math.[72] Plaintiff testified that he was working on a

---

[65] *Id.* at 1211–95.
[66] *Id.* at 312–20.
[67] *Id.* at 313.
[68] *Id.* at 317–18.
[69] *Id.* at 318.
[70] *Id.*
[71] *Id.* at 49.
[72] *Id.* at 50.

8

temporary basis, but that job ended as a result of being hospitalized with MRSA.[73] Plaintiff stated that he attempted to work other jobs but was incapable of sustaining the demands of the jobs.[74]

Plaintiff stated that he had been diagnosed with a number of different illnesses. Because he did not have insurance, he would seek treatment at the emergency room.[75] Plaintiff further stated that he is scared to go out in public because he gets sick easily.[76]

Plaintiff stated that he has no strength and cannot stand for more than about 45 minutes because of his back pain.[77] He further testified that he spends a lot of time lying down.[78]

Plaintiff testified that he had difficulty following instructions.[79] Plaintiff indicated that he suffered from stress because of his quality of life.[80] He experiences bouts of depression and sometimes just [lies] in bed.[81] At times, he does not even leave his room.[82]

A supplemental hearing was held to get further testimony from the vocational expert.[83] After receiving a hypothetical question from the ALJ, the vocational expert opined that the hypothetical person would be able to work as a hand packager, a linen room attendant, and a

---

[73] *Id.* at 50–51.
[74] *Id.* at 51.
[75] *Id.* at 54.
[76] *Id.*
[77] *Id.* at 55.
[78] *Id.*
[79] *Id.* at 56.
[80] *Id.*
[81] *Id.* at 57.
[82] *Id.*
[83] *Id.* at 37.

retail store laborer.[84] The vocational expert testified that these jobs would not involve reading and writing, and would not require a significant amount of math.[85]

D. THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claim. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of October 15, 2014.[86] At step two, the ALJ found that Plaintiff suffered from a number of severe impairments.[87] At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.[88] At step four, the ALJ determined that Plaintiff could not perform his past relevant work.[89] At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform and, therefore, he was not disabled.[90]

### III. DISCUSSION

Plaintiff raises the following issues in his brief: (1) whether the ALJ failed to properly evaluate whether Plaintiff can sustain full-time work; and (2) whether the ALJ made factual errors in his evaluation of the medical evidence.

---

[84] *Id.* at 41.
[85] *Id.* at 41–42.
[86] *Id.* at 17.
[87] *Id.*
[88] *Id.* at 18.
[89] *Id.* at 26.
[90] *Id.* at 26–28.

A. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff first argues that the ALJ erred when he found that Plaintiff had the residual functional capacity to perform medium work, with certain limitations. An individual's residual functional capacity "is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."[91] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."[92]

Plaintiff asserts that, due to his frequent hospitalizations, full-time work would be precluded. At the hearings before the ALJ, the vocational experts testified that one to two absences per month would be acceptable, but more absences would preclude all work.[93] Plaintiff points out that he had been seen in the emergency room 34 times in the three-year period prior to his hearing and that a number of these resulted in multi-day hospitalizations. Based upon this, Plaintiff contends that he could not work on a regular and continuing basis.

The ALJ acknowledged Plaintiff's multiple hospital visits. However, the ALJ noted that Plaintiff treats almost exclusively at the emergency room because he has no money or health insurance. Additionally, the ALJ noted that Plaintiff was often noncompliant with his treatment and that his conditions improved when he was compliant with medical treatment and medications. The ALJ stated:

> The hospital records show a consistent pattern. The claimant receives antibiotics in the hospital, his condition improves and he is discharged. Then he is noncompliant

---

[91] SSR 96-8p, at *2 (July 2, 1996).

[92] Id.

[93] R. at 44, 63.

11

in taking antibiotics at home, his condition worsens and then has to return to the hospital. This cycle has repeated over and over every month or so since 2014.[94]

Based upon this pattern, the ALJ concluded that it was

> reasonable to infer the claimant's condition would markedly improve and would not require so many hospital visits if he was compliant with his prescribed medications. In sum, the record shows the claimant improves with medication. He has not availed himself of all treatment modalities. Additionally, the record does not show the claimant has pursued any no cost or low cost medication options which would be available to him. The claimant's failure to avail himself of all the treatment modalities in [sic] inconsistent with his allegations of debilitating chronic pain, which renders his overall allegations of disability less persuasive.[95]

Plaintiff takes issue with the ALJ's conclusion. Plaintiff argues that the ALJ failed to consider the fact that Plaintiff was non-compliant with medication due to issues with cost. If Plaintiff was "unable to follow a prescribed regimen of medication and therapy to combat [his] disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits."[96] However, the ALJ found that the record did not show that Plaintiff sought out any no cost or low cost medication options.

Plaintiff contends that there is no evidence that low-cost medications were available. This argument is contradicted by the record. There is evidence that Plaintiff made use of free clinics,[97] was encouraged to do so,[98] and that efforts were made to get Plaintiff financial assistance so that his treatments would be covered.[99] There is also evidence that Plaintiff was

---

[94] *Id.* at 22.

[95] *Id.* at 22–23.

[96] *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992); *see also Allen v. Apfel*, No. 99-3249, 2000 WL 796081, at *3 (10th Cir. June 21, 2000) (unpublished opinion) (citing *Murphy*).

[97] R. at 433–38.

[98] *Id.* at 609.

[99] *Id.* at 857.

12

assigned a social worker to provide him resources, but he never followed up.[100] There is additional evidence discussed by the ALJ that Plaintiff failed to pick up other prescriptions and did not otherwise follow up on treatment.[101] While some of this could be cost related, it supports the ALJ's conclusion that Plaintiff failed to take advantage of all potential care options and, had he done so, would not have required so many hospitalizations.

Plaintiff also argues that the ALJ failed to consider the side effects he experienced when he switched to a lower cost medication. However, Plaintiff fails to explain how these side effects cast doubt on the ALJ's decision.

Plaintiff further argues that the ALJ's conclusion is not supported because he continued to be hospitalized during a period when he was taking his prescribed medication, methotrexate. However, these hospitalizations, during a relatively brief period of time, do not detract from the ALJ's overall conclusion that Plaintiff would not require so many hospitalizations if he were compliant with his treatment. The record supports this conclusion.

B.  MEDICAL EVIDENCE

Plaintiff next argues that the ALJ failed to properly evaluate the medical evidence in two respects. First, Plaintiff asserts that the ALJ erred in stating that an MRI of Plaintiff's spine showed only mild findings. Second, Plaintiff contends that the ALJ's residual functional capacity assessment was inconsistent with the opinion of Dr. Ottesen, which the ALJ gave great weight.

---

[100] *Id.* at 973.
[101] *Id.* at 21–22.

The ALJ stated that Plaintiff's physical examinations were consistently unremarkable. As support, the ALJ stated that "an MRI of the lumbar spine showed only mild disc desiccation."[102] However, Plaintiff points to imagining that showed severely decreased disc height and circumferential disc bulge with moderate bilateral foraminal narrowing.[103] While Plaintiff is correct in his reading of the imaging study, he fails to demonstrate how the ALJ's failure to discuss this specific evidence results in prejudice. The ALJ considered not only the imaging, but also a number of physical examinations which showed normal gait and station, normal range of motion, and no spinal tenderness.[104] In addition, Dr. Perel's notes indicated that Plaintiff obtained relief with pain medications and was not prescribed further treatment, such as physical therapy.[105] This evidence supports the ALJ's residual functional capacity assessment. Moreover, Plaintiff does not argue that this imaging dictated further limitations in the residual functional capacity and does not argue that he would not have been able to perform the jobs identified by the ALJ because of any such limitations. And the evidence does not support such a finding. Therefore, this argument must be rejected.

Plaintiff next challenges the ALJ's treatment of Dr. Otteson's opinion. Dr. Otteson examined Plaintiff and administered a number of tests. The scores from one test, the Wide Range Achievement Test-Revision 3 ("WRAT-3"), indicated that Plaintiff could read on an eighth grade level, spell on a fifth grade level, and had mathematical abilities consistent with the

---

[102] *Id.* at 23.
[103] *Id.* at 599.
[104] *Id.* at 23.
[105] *Id.* at 600.

fourth grade.[106] At the conclusion of his evaluation, Dr. Otteson recommended that Plaintiff receive assistance with any tasks that are above his intellectual functioning or which require at least and eighth grade level in reading, spelling, and arithmetic.[107] The ALJ gave significant weight to Dr. Otteson's opinion and limited Plaintiff to work that can be performed at an eighth grade reading, writing, and math level.[108]

Plaintiff contends that Dr. Otteson's opinion is internally inconsistent and the ALJ was required to resolve the conflict between the results of the WRAT-3 and Dr. Otteson's ultimate conclusion. In making this argument, however, Plaintiff focuses on the results of the WRAT-3 and ignores the fact that it was just one of many tools Dr. Otteson used in rendering his opinion. Simply because one test suggested greater limitations does not mean that Dr. Otteson's opinion is strictly limited to those test results. Instead, Dr. Otteson's opinion was rendered based on a review of all of the information gathered during his assessment of Plaintiff.

Further, even assuming that the ALJ erred in not further limiting Plaintiff's residual functional capacity, any such error was harmless. The Commissioner points to testimony from the vocational expert who stated that the jobs of hand packager, linen room attendant, and retail store laborer involved no reading or writing and would not require a significant amount of mathematics.[109] This testimony is consistent with the descriptions of these positions in the Dictionary of Occupation of Titles, as will be discussed below.

---

[106] *Id.* at 317.
[107] *Id.* at 318.
[108] *Id.* at 25.
[109] *Id.* at 41–42.

Plaintiff argues that this is improper post-hac rationalization on the part of the Commissioner. However, the Tenth Circuit employed a similar approach in *Lane v. Colvin*.[110] There, the plaintiff argued that the ALJ failed to account for one of her limitations in determining her residual functional capacity.[111] The Tenth Circuit held that any error was harmless.

The court examined the job (bottling-line attendant) that the vocational expert testified the plaintiff could perform. Reviewing the Dictionary of Occupational Titles, the court noted that taking instruction or helping was not significant and the activity of talking was not present.[112] "Thus, the job of bottling attendant does not involve frequent or prolonged interaction with supervisors or co-workers."[113] Based upon this, the court found that there was "no actual conflict between a limitation on frequent and prolonged interaction with supervisors and co-workers and the bottling-line attendant job identified by the VE's testimony, any oversight by the ALJ in including this limitation is harmless error."[114]

The same result is warranted here. The vocational expert and the ALJ identified the following jobs: hand packager, linen room attendant, laborer, sales attendant, officer helper, and assembler.[115] The Dictionary of Occupational Titles provides that the jobs of hand packager,[116]

---

[110] 643 F. App'x 766 (10th Cir. 2016).

[111] *Id.* at 767.

[112] *Id.* at 770.

[113] *Id.*

[114] *Id.*

[115] R. at 27.

[116] DOT No. 920.587-018, 1991 WL 687916.

linen room attendant,[117] and laborer [118] have math and language at a level 1, the lowest level of aptitude, and require minimal writing skills. Between these three jobs, there are 550,000 jobs in the national economy Plaintiff could perform. This is legally sufficient.[119] Therefore, any failure to include additional limitations was harmless.

IV. CONCLUSION

Accordingly, the Court hereby AFFIRMS the decision below.

DATED this 27th day of November, 2019.

BY THE COURT:

Paul Kohler
United States Magistrate Judge

---

[117] DOT No. 361.687-018, 1991 WL 672992.

[118] DOT No. 922.687-058, 1991 WL 688132.

[119] *Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) (finding 152,000 jobs in the national economy sufficient).